PSS:WPC
F.#2012R01458

**12 M 903**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

YEVGENIY PIKUS,

           Defendant.

<u>TO BE FILED UNDER SEAL</u>

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF APPLICATION FOR
<u>AN ARREST WARRANT</u>

(T. 18, U.S.C, § 371)

- - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, ss:

      JOHN CROES being duly sworn, deposes and states that he is a Special Agent with the United States Department of Health and Human Services, Office of the Inspector General ("HHS-OIG"), duly appointed according to law and acting as such.

      In or about and between December 2009 and August 2011, within the Eastern District of New York and elsewhere, the defendant, YEVGENIY PIKUS, together with others, did knowingly and willfully conspire to offer and pay cash kickbacks, directly and indirectly, overtly and covertly, in order to induce the referral of Medicare and Medicaid beneficiaries to a physician at a medical practice located in Queens, New York, for the furnishing, and arranging for the furnishing, of items and services for which payment may be made in whole and in part under Medicare and Medicaid, and to induce Medicare and Medicaid beneficiaries to purchase, lease, order, and arrange for and

recommend purchasing, leasing and ordering of any good, service and item for which payment may be made in whole and in part under Medicare and Medicaid, contrary to Title 42, United States Code, Section 1320a-7b(b)(1) and (2).

(Title 18, United States Code, Section 371).

The source of your deponent's information and the grounds for his belief are as follows:[1]

1. I have been a Special Agent with HHS-OIG for approximately 2 years. During my tenure with HHS-OIG, I have participated in a variety of criminal health care fraud investigations, during the course of which I have interviewed witnesses, conducted physical surveillances, executed search warrants, and reviewed health care claims data, bank records, phone records, medical records, invoices, and other business records. I am familiar with the records and documents maintained by health care providers and the laws and regulations related to the administration of the Medicare program and other health care benefit programs. I am now participating in an investigation that relates to allegations of violations, and attempted violations of, and conspiracies to violate, among other things, Title 42, United States Code, Section 1320a-7b(b)(Kickbacks), and

---

[1] Because this affidavit is submitted for the limited purpose of establishing probable cause for an arrest warrant, I have not set forth each and every fact learned during the course of the investigation.

2

Title 18, United States Code, Section 1347 (Health Care Fraud) (collectively the "Specified Federal Offenses"), by the defendant YEVGENIY PIKUS and others.

2. I have personally participated in the investigation of the offenses discussed below. I am familiar with the facts and circumstances of this investigation from: (a) my personal participation in this investigation, (b) reports made to me by other law enforcement authorities, and (c) information obtained from confidential sources of information.

3. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge.

At all times relevant to this Complaint, unless otherwise indicated:

I. BACKGROUND REGARDING HEALTH CARE BENEFIT PROGRAMS

4. The Medicare program ("Medicare") was a federal health care program providing benefits to persons who were over the age of 65 or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

5. The New York State Medicaid program ("Medicaid") was a federal and state health care program providing benefits to

3

individuals and families who met specified financial and other eligibility requirements, and certain other individuals who lacked adequate resources to pay for medical care. CMS was responsible for overseeing the Medicaid program in participating states, including New York. Individuals who received benefits under Medicaid were similarly referred to as "beneficiaries."

6. Medicare and Medicaid were each a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

7. Medicare was subdivided into multiple Parts. Medicare Part B covered the costs of physicians' services and outpatient care, such as physical therapy, occupational therapy, and diagnostic tests. Generally, Medicare Part B covered these costs if, among other requirements, they were medically necessary and ordered by a physician.

8. Medicaid covered the costs of medical services and products ranging from routine preventive medical care for children to institutional care for the elderly and disabled. Among the specific medical services and products provided by Medicaid were physical therapy, occupational therapy, and diagnostic tests. Generally, Medicaid covered these costs if, among other requirements, they were medically necessary and ordered by a physician.

4

9. A physician or medical clinic that sought to participate in Medicare Part B and Medicaid and to bill Medicare and/or Medicaid for the cost of their treatment of Medicare and Medicaid beneficiaries and related benefits, items, and services was required to apply for and receive a provider identification number ("PIN"). The PIN allowed a physician or medical clinic to submit bills, known as "claims," to Medicare and Medicaid to obtain reimbursement for the cost of treatment and related health care benefits, items, and services that they had supplied or provided to beneficiaries.

10. Medical providers were authorized to submit claims to Medicare and Medicaid only for services they actually rendered and were required to maintain patient records verifying the provision of services.

11. To receive reimbursement from Medicare for a covered service, a medical provider was required to submit a claim, either electronically or in writing, through Form CMS-1500 or UB-92. To receive reimbursement from Medicaid for a covered service, a medical provider was required to submit a claim, either electronically or in writing, through New York State eMedNY-150003 claim form. Both claim forms required certain important information, including: (a) the beneficiary's name and identification number; (b) the PIN of the doctor or other qualified health care provider who ordered the health care

5

benefit, item, or service that was the subject of the claim; (c) the health care benefit, item, or service that was provided or supplied to the beneficiary; (d) the billing codes for the benefit, item, or service; (e) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (f) whether or not the beneficiary was also a Medicaid or Medicare recipient. By submitting the claim, the provider was certifying, among other things, that the services that were rendered to the patient were medically necessary.

II. FACTS SUPPORTING PROBABLE CAUSE

12. YEVGENIY PIKUS was the office manager of the medical practice of Dr. Jane Doe located at 70-64 Yellowstone Boulevard, Queens, New York (the "MP"). PIKUS was also the spouse of Dr. Jane Doe.

13. The MP was a New York State corporation doing business in Queens, New York and was certified to participate in Medicare and Medicaid under its own PIN. The MP allegedly provided, among other things, physical therapy and diagnostic tests to Medicare and Medicaid beneficiaries and submitted claims to Medicare and Medicaid for such services.

14. The MP used at least two different ambulette services for its Medicare/Medicaid patient beneficiaries as a necessary service. An ambulette service transports Medicare and Medicaid beneficiaries to and from their residences for medical

6

appointments. Such services can only be provided and reimbursed for under Medicaid if a physician determines that they are necessary.

Co-conspirator #1

15. Co-conspirator #1 ("CC-1"), an individual whose identity is known to your affiant, was the owner and operator of one ambulette company (the "CC-1 Company") and later became an employee of the ambulette company owned by Co-conspirator #2 ("CC-2")(the "CC-2 Company"), an individual whose identity is known to your affiant. Ambulette companies such as the CC-1 Company and the CC-2 Company bill Medicaid directly for their services and receive approximately $60 for each beneficiary they take to and return from a medical facility.

16. CC-1 pleaded guilty to an Information charging a conspiracy to furnish healthcare kickbacks to beneficiaries using the ambulette service of the CC-1 Company and the CC-2 Company in violation of Title 18, United States Code, Section 371, and agreed to provide information and assist law enforcement agents in this investigation. As set forth below, CC-1, CC-2 and the defendant YEVGENIY PIKUS engaged in a scheme to pay kickback payments to Medicare/Medicaid beneficiaries when those beneficiaries used the CC-1 Company and/or the CC-2 Company to travel to and from the MP for medical services.

17. CC-1 informed your affiant that starting in 2009

7

CC-1 paid and handed money to Medicare/Medicaid beneficiaries who used the CC-1 Company to bring them to the MP for medical treatment.

18. CC-1 informed your affiant that the defendant YEVGENIY PIKUS and CC-1 discussed the amount of the kickbacks. In early 2009, CC-1 met with PIKUS, and they discussed paying $50 to each beneficiary who used the CC-1 Company to go to the MP. They agreed that CC-1 would pay $15 and that PIKUS would pay the other $35 to those beneficiaries.

19. CC-1 informed your affiant that CC-1 regularly met the defendant YEVGENIY PIKUS at the MP where PIKUS paid his portion of the kickback funds and hand the money to CC-1 for distribution to the beneficiaries.

20. In or about March 2011, CC-1 started working for the CC-2 Company and was instructed by CC-2 on a number of occasions to distribute kickback funds to beneficiaries transported to the MP, which CC-1 did.

Co-conspirator #3

21. Co-conspirator #3 ("CC-3"), an individual whose identity is known to your affiant, was a Medicare/Medicaid beneficiary who used the CC-2 Company's services and the MP's services and who received kickback payments. Based upon CC-3's conversations with other beneficiaries, CC-3's understanding was that he/she would receive the kickback payments when he/she

8

received physical therapy treatment at the MP and used the CC-2 Company to travel between the MP and CC-3's residence. CC-3 stated that CC-3 received the kickback payments from another beneficiary who received them from CC-1. A review of the claims data for the CC-1 Company and the CC-2 Company from December 2009 to August 2010 reveals that companies billed Medicaid for transporting CC-3 to and from the MP.

22. CC-3 informed your affiant that Medicare/Medicaid beneficiaries were initially paid a kickback of $50 per visit to go to the MP. CC-3 informed your affiant that the kickback payment was later reduced to $40 per visit.

23. On September 23, 2010, CC-3 told the defendant YEVGENIY PIKUS that CC-3 was owed kickback funds for past visits to the MP. The meeting was conducted in Russian and was recorded. I have reviewed a translated summary transcription of that meeting. In the meeting, CC-3 also complained that other clinics provided higher kickback payments. PIKUS responded in sum and substance and in part that the clinics which pay higher kickback fees are under surveillance by law enforcement and as an example stated that a Dr. John Doe was visited by law enforcement the day before or so and his office was "taken by surprise." It should be noted that Dr. John Doe was arrested on September 22, 2010 and later indicted and convicted for health care fraud in the Eastern District of New York.

WHEREFORE, your affiant respectfully requests that an arrest warrant be issued for YEVGENIY PIKUS so that he may be dealt with according to law.

Furthermore, your affiant respectfully requests that this affidavit and arrest warrant be filed under seal so as to protect the integrity of the investigation.

JOHN CROES
Special Agent
Health and Human Services
Office of Inspector General

Sworn to before me this
___1___ day of October, 2012

S/Reyes

THE HONORABLE R.
UNITED STAT[ES]
EASTERN DIS[TRICT]